UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT NORTH CAROLINA

In re:

| | | |
|---|---|---|
| George V. Kontos, | ) | Case no: 12-50156 |
| | ) | |
| Debor | ) | Chapter 7 |
| _____ | ) | |
| Thanco Products and Imports, Inc. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv No: 12-6073 |
| | ) | |
| George V. Kontos, | ) | |
| | ) | |
| Defendant. | ) | |
| _____) | | |

DEFENDANT'S REPLY BRIEF and MEMORANDUM of LAW

NOW COMES defendant, by and through his undersigned counsel, and submits this reply brief in response to the brief of plaintiff and in support of defendant's positions in the case. In this brief, defendant seeks to set forth the factual basis and legal theories that support the dismissal of plaintiff's claims, and the granting of discharge in the underlying bankruptcy proceeding.

**Issues:**

1.      Whether defendant transferred, removed, destroyed, mutilated or concealed property belonging to the estate within the one year of filing the petition with intent to hinder, delay or defraud a creditor of the estate. 11 U.S.C. §727(a)(2).

2.      Whether defendant knowingly and fraudulently in or in connection with the case made a false oath or account. 11 U.S.C. §727(a)(4).

**Procedural Background**

On February 6, 2012, debtor/defendant filed a petition for relief under Chapter 7 of the United States Bankruptcy Code. Plaintiff is a creditor of defendant by virtue of a judgment obtained against defendant in the United States District Court for the Southern District of Texas in a case styled *Thanco v. Kontos*, case number 4:08-CV-3046, affirmed by the U.S. Court of Appeals for the Fifth Circuit on November 18, 2010. Plaintiff filed the present action objecting to defendant's discharge in his bankruptcy case. Plaintiff bases its objections to discharge on 11 U.S.C. §727(a)(2) and §727(a)(4).

**Law**

Fundamentally, it is clear that the burden in any action objecting to a debtor's discharge lies squarely with the objecting creditor. Rule 4005 of the Federal Rules of Bankruptcy Procedure; *Grogan v. Garner*, 498 U.S. 279, 287 (1991); *Farouki v. Emirates Bank*, 14 F.3d 244, 249 (4th Cir. 1994); *In re Michael*, 452 B.R. 908, 916 (Bankr.M.D.N.C. 2011). Further, "[o]bjections to discharge are to be construed liberally in favor of the debtor." *In re Johnson*, 82 B.R. 801, 804 (Bankr.E.D.N.C. 1988) (citing *In re Epperson*, 45 B.R. 708 (Bankr.E.D.Tenn. 1985)). Restated, "given that the denial of a debtor's discharge 'imposes an extreme penalty for wrongdoing', Section 727 must be construed strictly against those who object to a debtor's discharge and 'liberally in favor of the bankrupt.'" *In re Ogalin*, 303 B.R. 552 (D.Conn. 2004) (citing *In re Chalasani*, 92 F.3d 1300, 1310 (2d Cir. 1996)).

Plaintiff expends significant verbiage in its brief arguing that defendant is a partner in the business Buy Greek Art, a d/b/a operated by defendant's mother, Martha Kontos. However, plaintiff's argument on this issue can simply be addressed by plaintiff's own acknowledgement

that, "[w]hether the debtor was or is a partner in [Buy Greek Art] is not an issue directly before the Court in this case." Accordingly, any argument on this issue can be summarily ignored by the court. Plaintiff additionally makes a number of comments and personal conclusions about the defendant's lifestyle, including stating the defendant claims to live a carefree lifestyle. These comments are unsupported by any evidence in the record, and only serve to falsely attack the defendant personally. They are irrelevant, inflammatory and should be summarily ignored by the court.

## I. 11 U.S.C. §727(a)(2); Fraudulent Transfer

As noted, in the present case plaintiff relies on 11 U.S.C. §727(a)(2) for one of his bases for objecting to discharge. In order to prevail in a cause of action pursuant to §727(a)(2), the creditor must establish four elements. (*In re Arnold*, Case No. 07-11543, p6 (Bankr. M.D.N.C. 12/30/2009). Creditor must establish, "that the debtor (1) transferred or concealed, (2) his property, (3) with the intent to hinder, delay or defraud a creditor, (4) within one year before filing the petition." *Id*. These elements will be addressed individually.

### A. TRANSFER

The transfer at issue in this case involves a registered transfer of trademarks from defendant to an entity known as BGA Hellas, based in Greece. The trademarks at issue are specifically identified as the following and will hereinafter be referenced collectively as "the trademarks": serial number 77307960 "Greek Time"; serial number 78930054 "Official Member Greek Mafia; serial number 77215923 "What happens at the Greek Festival… Stays at the Greek Festival"; serial number 77034851 "Greek American Princess"; serial number 77095213 "Greek by Marriage". On or around January 30, 2007, defendant registered the

trademarks with the United States Patent and Trademark Office ("USPTO"). Defendant has since testified that the trademarks were actually used by his mother, Martha Kontos, through her d/b/a business, Buy Greek Art. (See 2004 Examination of George Kontos, pp.24-25.) On or around November 9, 2009, defendant transferred the trademarks to BGA Hellas in exchange for 3,000 euros, or approximately $5,000 US. It is this transfer that is at issue. Such transfer occurred and is memorialized by the assignment of trademarks document on file with the USPTO. Accordingly, there is no dispute that a transfer occurred and the first element of plaintiff's prima facie case on this argument is met.

## B. OWNERSHIP

Plaintiff must also establish that defendant actually owned the asset transferred in order to prevail in its objection to discharge. *Arnold* at p6. While a transfer of the trademarks occurred, defendant was not the owner of the trademarks at the time of the transfer. "The exclusive right to a trademark belongs to the one who first uses it in connection with specified goods." *Blue Bell, Inc. v. Farah Mfg*., 508 F.2d 1260, 1265 (1975). This principle has existed in intellectual property law for more than 100 years. See *McClean v. Fleming*, 96 U.S. 245 (1877). Despite this longstanding tenet, defendant did not realize that first use controlled trademark ownership when he registered the trademarks in 2007 or when he transferred them to BGA Hellas in 2009. (See 2004 Examination of George Kontos, pp.24-25). Indeed, the entire litigation in the Southern District of Texas in *Thanco v. Kontos* and the subsequent appeals was predicated on defendant's misunderstanding on this issue. It was not until defendant had exhausted his appeals in that action that he accepted this principle and recognized that he was not the owner of the "Got Ouzo" trademark. (*Id*. at 24 and 88.) At this same time, defendant recognized that this principle applied equally to the trademarks at issue in this matter and

realized that he had never been the owner of the trademarks as first use and the resulting ownership lay with his mother, Martha Kontos, and her d/b/a Buy Greek Art. (*Id*.) The actual ownership of the trademarks was explained by Martha Kontos in the following exchange during her deposition in this matter:

> Question:     The trademarks that were transferred from George to BGA Hellas,
>
> who did those trademarks belong to before they were transferred to BGA Hellas?
>
> Answer:     To me.
>
> Question:     At what point did they become your trademarks?
>
> Answer:     They were always my trademarks.

(Martha Kontos deposition, p. 6)

Regardless of defendant's own belief at any time regarding the ownership of the trademarks, the concept of first use controls such ownership. Pursuant to this principle, defendant was never the owner of the trademarks. Plaintiff argues in its brief that no court has ever determined that defendant was not the owner of the trademarks. However, no court has ever been asked to make such determination. As noted, the principle of first use controls on this issue. Plaintiff has presented no evidence in this matter which could establish that defendant ever owned the trademarks. In fact the only evidence on this point is defendant's own testimony which establishes plainly that Martha Kontos d/b/a Buy Greek Art was the only user of the trademarks, and thus, was the lawful owner of the trademarks, regardless of whether defendant had personally registered the trademarks, just as he had registered the Got Ouzo? trademark. (*Id*.) Plaintiff's witness conceded this point at trial by testifying that plaintiff was aware during the early stages of the civil litigation that Buy Greek Art was owned by Martha Kontos, and not George Kontos. Plaintiff's witness admitted to seeing the recorded assumed name certificate

recorded in year 2004 showing Martha Kontos as the owner of Buy Greek Art. Ironically, plaintiff's argument on the ownership issue stands in direct contrast to the position plaintiff successfully argued throughout the years long litigation in the Southern District of Texas in *Thanco v. Kontos*. Because defendant was not the owner of the trademarks at the time of the transfer to BGA Hellas, plaintiff cannot establish its prima facie case pursuant to §727(a)(2), plaintiff's objection must be overruled and discharge must be granted.

### C. FRAUDULENT INTENT

The third element plaintiff must establish to prevail in its objection to defendant's discharge is that defendant transferred assets with the intent to hinder, delay, or defraud a creditor. *Arnold* at p6. There is no direct evidence in this case that defendant intended to hinder, delay, or defraud any creditor. In the absence of any direct evidence, plaintiff correctly notes that courts often rely on certain "badges of fraud" as circumstantial evidence of such intent. *In re Fields*, Case No. 08-2038, p7 (Bankr. M.D.N.C. 2010). The badges of fraud considered by this court include:

> (1) lack of consideration for the transfer; (2) a family relationship between the parties; (3) some retention of the property for personal use; (4) suspicious financial condition before or after the transfer; (5) the existence of a pattern or series of transactions after the incurring of debt, onset of financial difficulties, or pendency of threat of suit by creditors; and (6) suspicious chronology of events and transactions under inquiry.

*Id*. "An attempt to keep the transfer a secret has also been recognized as a seventh badge of fraud." *Id*.

### 1. Lack of Consideration

The first badge of fraud outlined in *Fields* is a lack of consideration for the transfer. *Id*. In the present case, the evidence is uncontroverted that BGA Hellas paid defendant approximately

$5,000 US for the trademarks in November 2009. (See 2004 Examination of George Kontos, p. 23). Plaintiff argues that the basis for this purchase price was not related to the market value. However, plaintiff has offered no evidence of what the market value of the trademarks would or would not have been. There is, thus, no evidentiary basis for this argument on plaintiff's part. In fact, the only evidence before the court on this point is that defendant was paid $5,000 US for the trademarks by BGA Hellas. Such payment is itself consideration. This badge of fraud, thus, weighs in favor of the absence of fraudulent intent.

### 2.    Family Relationship

This court has also looked to the existence of a family relationship between the parties to determine if a transfer was made with fraudulent intent. *Fields* at p7. At the time of the transfer at issue, BGA Hellas was controlled by Nick Yiannakopolous. (See 2004 examination testimony of George Kontos, p. 58). Defendant has described Yiannakopolous as a friend he would visit during his trips to Greece. (*Id*. at 58-60). Defendant further testified that he had not had contact with Yiannakopolous for approximately three years at the time of his 2004 examination testimony. (*Id*. at 62.) In fact, as evidenced by his trial testimony, defendant did not even realize that Yiannakopolous had died by the time Buy Greek Art was prepared to purchase the trademarks back from BGA Hellas. Defendant further did not know the nature of Yiannakopolous's family relationships, such that defendant had to literally walk around Yiannakopolous's home town in an effort to identify and locate Yiannakopolous's descendants. While defendant and Yiannakopolous had a friendly relationship, their relationship clearly did not rise to the level of a familial relationship sufficient to qualify as a badge of fraud in this case.

### 3. Retention of Benefits

The next badge of fraud outlined in the *Fields* case is, "some retention of the property for personal use." *Fields* at p7. Plaintiff argues that this element should weigh against defendant in this case because plaintiff alleges that defendant continued to utilize the trademarks after the transfer to BGA Hellas. In fact, the evidence establishes that the trademarks were used by Buy Greek Art, the d/b/a of Martha Kontos. (See 2004 Examination of George Kontos, pp.24-25). Defendant did not personally use the trademarks at any point, either before or after the transfer to BGA Hellas. Even if the court were to give credence to plaintiff's argument that defendant was using the trademarks through Buy Greek Art after the transfer, there is no evidence to suggest that the use of the trademarks was a true retention of the benefit of ownership. In fact, with intellectual property, royalty free licensing arrangements are exceedingly common. A simple internet search reveals scores of images available for royalty free use. The fact that Buy Greek Art continued to use the trademarks after they were purchased by BGA Hellas is not evidence of retention of ownership. While the previously discussed principle of first use subsequently revealed that Buy Greek Art was always the owner of the trademarks, if the transfer from defendant to BGA Hellas had been valid, BGA Hellas would have had all the rights of ownership, including the right to resell the trademarks to any purchaser and the right to demand that any user of the trademarks, including Buy Greek Art, cease and desist from use of the trademarks. Accordingly, this element does not serve to establish fraudulent intent.

### 4. Suspicious Financial Condition

In *Fields*, this court noted that "suspicious financial condition before or after the transfer" could be considered a badge of fraud. *Fields* at p7. Defendant has testified that he had no other assets at the time of the transfer of the trademarks to BGA Hellas. (See 2004 testimony of

George Kontos, p. 61). The absence of other assets at the time of the transfer is not itself conclusive evidence that defendant's financial situation was "suspicious". Indeed, a lack of assets is a trait common to many bankrupt debtors. In fact, the argument that this transfer was intended to defraud defendant's creditors is flawed on this point as the asset exchanged for the trademarks, the $5,000, would have actually been more easily accessible to creditors than the trademarks themselves as the cash proceeds were much more liquid than were the trademarks themselves. As such, this element does not lend itself toward proving that defendant transferred the trademarks with fraudulent intent.

### 5. Pendency or Threat of Suit

Another prospective badge of fraud recognized by this court is, "the existence of a pattern or series of transactions after the incurring of debt, onset of financial difficulties, or pendency or threat of suit by creditors." *Fields* at p7. Plaintiff does not make any allegation in this case that the transfer of the trademarks was part of a larger pattern or series of transactions. Instead, plaintiff merely notes that defendant was already embroiled in federal litigation with plaintiff over the Got Ouzo? trademark at the time plaintiff transferred the trademarks to BGA Hellas. This lone transaction is clearly not sufficient to establish a "pattern or series of transactions" sufficient to be considered a badge of fraud in this case.

### 6. Suspicious Chronology

While this court has recognized a "suspicious chronology of events and transactions under inquiry" as a separate prospective badge of fraud (*Id*.), the preceding argument applies equally to rule this prospective badge out in the present case. As noted previously, there was no pattern or series of transactions in this case. Instead, the transfer at issue was a single event which occurred in the midst of a lengthy federal litigation process between defendant, a debtor

with limited means, and plaintiff, a corporate entity. The fact that defendant, who had no definable income, would run out of money and assets to liquidate while representing himself before the federal court system, is not, itself, evidence of any fraudulent intent on the part of defendant, but more an indication that the defendant would need to have funds to continue his defense.

### 7.    Secrecy of Transfer

Plaintiff has correctly noted that the court will often look to the secrecy of a transaction as another prospective badge of fraud, which was also recognized by this court in *Fields*.  *Id*. Plaintiff rightly concedes that defendant made no effort to conceal the transfer of the trademarks at issue.  Indeed, defendant registered the transfer with the U.S. Patent and Trademark Office in a publicly available filing.  The transfer was, thus, anything but concealed.  Accordingly, this prospective badge of fraud must weigh heavily in favor of the conclusion that defendant had no fraudulent intent in the transfer of the trademarks.

As outlined, each of the badges of fraud used by this court to determine whether a debtor's intent was fraudulent are appropriately addressed through a reasonable evaluation of the evidence before the court.  In balance, plaintiff is unable, through an analysis of the badges of fraud, to establish that defendant had the requisite fraudulent intent when he transferred the trademarks to BGA Hellas in 2009.  Therefore, the court must overrule plaintiff's objections and grant defendant a discharge in his chapter 7 bankruptcy.

### D.    WITHIN ONE YEAR PRIOR TO FILING

The final element for which plaintiff must carry the burden to establish a sustainable objection to discharge pursuant to §727(a)(2) is that the transfer was made within one year prior to the filing of the petition. *Arnold* at p6.  On its face, this element is clearly not met in this case

as the transfer at issue occurred on or around November 9, 2009 and defendant filed his bankruptcy petition on February 6, 2012, more than two years later. Thus, in order to even gain consideration on this element, plaintiff looks to the principle of continuing concealment.

On this point, plaintiff relies on *In re Olivier*, 819 F.2d 550 (5th Cir. 1987). Plaintiff correctly articulates this principle by quoting *Olivier* thus; "[t]he concealment of an interest in an asset that continues, with the requisite intent, into the year before bankruptcy constitutes a form of concealment which occurs within the year before bankruptcy and, therefore, that such concealment is within the reach of 727(a)(2)(A). *Olivier* at 555. As noted previously, the transfer of the trademarks was anything but concealed. In fact, the transfer was open and notorious as it was registered publicly with the U.S. Patent and Trademark Office. Continuing concealment further requires a retention of the benefits of ownership in addition to the transfer of title. *Id*. at 553. Also as previously discussed, defendant did not retain the benefits of ownership of the trademarks after the transfer to BGA Hellas. Despite the use of the trademarks by Buy Greek Art, BGA Hellas held exclusive ownership rights to the trademarks and was fully entitled to exercise those rights at its own discretion. The use of the trademarks in the absence of royalty payments is merely evidence of a relatively common royalty free licensing arrangement between BGA Hellas and Buy Greek Art. To the extent that plaintiff alleges that such use establishes a retention of the benefits of ownership on the part of defendant, plaintiff has presented no evidence to establish such position.

While the court in *Olivier* found that the continuing concealment doctrine served to bring the transfer at issue in that case within the one year time period relevant to a fraudulent transfer, *Olivier* can be easily contrasted from the present case. In *Olivier*, plaintiff was injured by the minor son of debtor-defendants. *Id*. Two days after the accident, defendants transferred title to

their home to female defendant's mother for a cash payment which was returned to female defendant's mother several days later. *Id*. Despite this transfer of title, defendants continued to live in the home, maintain the home, and pay for insurance on the home for more than seven years, all while paying no rent. *Id*. In contrast, in the present case, defendant transferred all rights to the trademarks to BGA Hellas in November 2009. Unlike in *Olivier*, defendant in the present case did not retain any interest in the trademarks. While the defendants in *Olivier* continued living and acting as though no transfer had occurred, defendant in this case recognized that he no longer had an ownership interest in the trademarks and acted accordingly. Even the use of the trademarks by Buy Greek Art, which plaintiff would contend was evidence of defendant's retention of the benefits of ownership, was merely use which benefited the company owned by defendant's mother, Martha Kontos. Defendant received no direct benefit from such use of the trademarks. Accordingly, the continuing concealment doctrine does not function in this case to bring the transfer at issue within the one year pre-petition period and, thus, plaintiff's objection to discharge must be overruled.

Based on the above analysis, it is clear that plaintiff's objection to discharge pursuant to 11 U.S.C. §727(a)(2) must fail. In order to succeed, plaintiff must carry his burden to establish the four relevant elements. In fact, the only element plaintiff has established is that a transfer occurred. The evidence before the court supports defendant's position on the remaining three elements. Defendant was not the owner of the trademarks at the time of the transfer as established by the first use doctrine. Defendant did not transfer the trademarks with the requisite intent to hinder, delay, or defraud his creditors. Finally, the transfer at issue did not occur within one year prior to the filing of defendant's bankruptcy petition. While the preceding argument establishes that plaintiff has failed to carry its burden on three out of four elements of plaintiff's

727(a)(2) objection, plaintiff must not only convince this court to a preponderance of the evidence that it has carried its burden on more than one of these elements, plaintiff must carry its burden on every one of the four elements. Plaintiff has clearly not carried this burden on this objection. Thus, plaintiff's objection to discharge pursuant to 11 U.S.C. §727(a)(2) must fail and defendant must be granted discharge in his chapter 7 bankruptcy proceeding.

## II.    11 U.S.C. §727(a)(4); False Statements

In order to prevail with an objection to discharge pursuant to 11 U.S.C. §727(a)(4), a creditor must establish five elements: "(1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with the intent to deceive; and (5) the statement related materially to the bankruptcy case." *In re Self*, 325 B.R. 224, 245 (Bankr. N.D.Ill. 2005).

In the present case, defendant is clearly someone who is very particular about what he says in response to any question asked of him. Defendant's experience with plaintiff in this long court battle has allowed defendant to foresee that responses given hastily and without careful thought can be manipulated or interpreted in a way to work for plaintiff and its case. To defendant, all words have meaning, and no answer should make assumptions about the question. This is obvious throughout his deposition testimony. An example of this is found in his testimony from his 2004 examination where he testified as follows:

> Answer: "Owner" is the wrong term. Hang on. With all due respect to both of you, the one thing I've learned in this whole thing with your client is one word can make or break a conversation. That is why I'm being so exactly specific on the questions so that I can answer them correctly so nobody comes back and say a-ha, this wasn't right, okay?

See 2004 examination testimony of George Kontos at pp. 21-22.

### A.     Plaintiff's Allegations of Misstatements

Plaintiff has set forth the following factual instances to support its contention that defendant has made a false statement under oath with the intent to deceive in this case. As will be explained, plaintiff has not carried its burden to establish that any of these instances rise to the level of misstatement sufficient to sustain plaintiff's objection to discharge.

### 1.     Defendant's statements about his ownership of the trademarks.

Defendant has maintained through all of his testimony that he believed he owned the trademarks at the time the trademarks were registered in 2009. As explained previously, defendant believed he was the owner of the trademarks at the time of registration and at the time of the transfer of the trademarks to BGA Hellas, but defendant later learned, through the litigation with plaintiff, that Martha Kontos, d/b/a Buy Greek Art had actually always been the owner of the trademarks by virtue of the doctrine of first use. This theory is the exact theory that plaintiff, used to prevail in the underlying Federal case which resulted in the judgment against defendant.

In defendant's 2004 examination on June 20, 2012 defendant explained his understanding very succinctly, and this testimony was reiterated in his testimony at trial:

> Question: And so I understand, at the time they were assigned to BGA Hellas, the marks belonged to your mother?
> Answer.  As I have learned now after going through the case?
> Question: Yes
>
> (Comment from Mr. Bolton)
>
> Answer: "Oh, oh, It's very very simple. Your client is the best example. He could probably explain to you if I don't do such a good job. The trademarks were issued in my name.  However, according to trademark law it doesn't matter whose name they're issued in, the person who actually has used them is the owner.  The best example for this is your client. I had the trademark "Got Ouzo" in my name. Your client came up and said, 'Excuse me. Doesn't matter that it's in his name. We use

it. We used it before he did. He may have the paperwork, but he doesn't have the trademark. He doesn't own it.' The same thing with these. I registered them. They were in my name. I did everything for my mother, but I did not own those trademarks. This is what I learned, one of the lessons I learned from this whole thing. Doesn't matter what paperwork you have. Trademark law is a different animal. And in trademark law, just because you have a piece of paper doesn't mean anything about ownership.

(See 2004 testimony of George Kontos at pp. 24-25)

From defendant's testimony, it is clear that defendant did not believe he was in fact the owner of the trademarks at the time frame of this testimony. He stated his basis for such a belief, and the basis is a sound basis given the legal preceding he had just lost over the prior three years. It is also the legal position espoused by plaintiff throughout the federal case in which they prevailed as owner of "Got Ouzo".

For these statements to be a false oath, defendant would have had to have believed the statements he was making were false at the time he was making them. On the contrary, his testimony establishes clearly that defendant believed the statements he was making regarding the ownership of the trademarks were correct at the time he made them. He learned reluctantly that his previous belief that registration was ownership was incorrect. Because he believed his statements regarding ownership to be accurate at the time that he made the statements, such statements are not sufficient to sustain plaintiff's objection to discharge.

    **2.**  **Sworn testimony at the 341 meeting**.

Defendant appeared at the duly scheduled 341 meeting and offered testimony during an examination by plaintiff's counsel. Defendant answered more than 130 questions at the 341 meeting. Plaintiff has called into question the veracity of defendant's responses to two questions. The first is this exchange:

Question: "And who are the owners of BGA Hellas?"

Answer**:** "I don't know."

(See 341 testimony of George Kontos at p. 22).

At trial, the testimony of defendant on this point was clear. At that time of the 341 meeting, he had recently tried to locate the individual he knew as the owner of BGA Hellas, Nick Yiannakopoulos, and had discovered that he was deceased. In his efforts to locate any heirs to his estate, defendant was directed to a surviving daughter, Ms. Daouti. Defendant's testimony at trial on this point is that he was not sure if Ms. Daouti was an owner of the decedent's business, or merely an heir to the assets of the decedent. From his testimony, defendant believed his response to be truthful. He did not know if she was an owner of BGA Hellas. There was no evidence she held herself out to be anything but the daughter of Yiannakopoulos. In his trial testimony, defendant explained that it was sufficient for him to believe she was the heir to his assets and therefore had the legal capacity to transfer title to the trademarks. He confirmed that he did not know for certain at the time of the transfer or at the time of the 341 meeting whether Ms. Daouti was an owner of BGA Hellas.

The second statement from the 341 meeting noted by plaintiff is as follows:

Question: "Do you happen to remember the names of the individuals you dealt with to sell the trademarks?"

Answer: "No, I'm sorry."

(*Id*. at p. 23).

This testimony is a misstatement by defendant. He knew or should have known and remembered at the time the person he dealt with was Nick Yiannakopoulous. Defendant confirmed this mistake with his testimony at trial. He offered testimony of his nervousness at the 341 meeting, and his embarrassment at appearing in front of a large group of people and being

questioned about his financial failures in life. It is true that the 341 testimony is sworn testimony, but it is testimony given while standing at a table, in front of a number of people sitting directly behind you, in an atmosphere of quick paced handling of cases, far different from the atmosphere of a sit down deposition or trial. At trial, more than a year and a half later, when testifying about the experience, the defendant was still visibly emotional about that public experience.

While it is true that defendant made a misstatement on this point, plaintiff has not established to a preponderance of the evidence that such misstatement was material to the bankruptcy case as required to establish a sustainable objection to discharge. In fact, the identity of the individuals with which defendant dealt in transferring the trademarks was utterly immaterial to the bankruptcy proceeding. Defendant had transferred an asset to the entity and was compensated reasonably for that transfer. Further, the transfer had occurred more than two years prior to the filing of defendant's bankruptcy proceeding. As such, the misstatement by defendant during the stress of the 341 meeting setting is immaterial. Additionally, defendant promptly corrected his misstatement by providing accurate information on this point in his interrogatory responses and in his 2004 examination testimony. Accordingly, plaintiff has not carried its burden in establishing that this misstatement was material to the bankruptcy proceeding. Thus, the existence of this misstatement is not sufficient to support plaintiff's objection to discharge in this case.

### 3. Sworn testimony at the Rule 2004 examination on June 20, 2012

Defendant appeared at his deposition pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure and offered sworn testimony to questions of plaintiff's counsel. Plaintiff has called into question defendant's responses to questions from this deposition:

Question: "And again he ("Nick Yiannakoupoulos") is or was a friend of yours?"

Answer: "Yeah."

Question: "To your knowledge, he is the owner of BGA – or a member of BGA Hellas?"

Answer: "Is or was, yes."

(See 2004 testimony of George Kontos at p. 58).

Defendant's responses to both of these questions were factually true. There has been no evidence offered by plaintiff to even suggest these responses were untruthful. Though plaintiff's counsel had every opportunity to ask a follow up question to clarify defendant's response, no such question was ever asked. Plaintiff has offered the argument that the answer given would make it impossible for the questioner to know that Mr. Yiannakopoulos was deceased. This is a baseless allegation. In fact, a simple clarifying follow-up question would provide precisely the information plaintiff claims was inaccessible. Plaintiff's counsel, at length in his brief, purports to the Court that the defendant should have provided more complete answers to the questions, when in fact the real complaint should be counsel for Plaintiff should have ask additional questions until he received the answers he sought. In any event, defendant cannot be penalized for providing a truthful response merely because plaintiff and its counsel drew an incorrect inference from such truthful statement.

The second statement of defendant from the 2004 deposition in question is as follows:

Question: I am going to hand you what we are marking as Exhibit 4 Can you look at this?

Answer: Yes. I looked at it.

Question: Okay, And have you ever seen it before

Answer: This document?

Question: Yes.

Answer: No, it's the first time you gave it to me.

Question: Okay. So would it surprise you greatly to find out that BGA Hellas has assigned those trademarks back to your mother?

Answer: No, wouldn't surprise me greatly.

Question: But you never received any correspondence regarding the assignment?

Answer: Not that I — not that I know of.

(*Id*. at p. 65).

Here the defendant's testimony is clear and uncontroverted. He indicated he had not seen the recorded trademark document known as trial Exhibit P-21. Plaintiff has offered absolutely no evidence that the defendant had seen this document prior. Plaintiff wants the court to speculate that defendant was sent a copy, received a copy and read a copy from the U.S. Patent and Trademark Office. Plaintiff had every opportunity during the fourteen (14) months following the 2004 examination until trial to verify with the trademark office where and if this notice was mailed to anyone, and failed to do so. Plaintiff exhorts the court to speculate that defendant had, in fact, received some documentation and was lying about such receipt during his 2004 testimony. However, it is not the court's role to speculate as to what may or may not have occurred. Instead, it is plaintiff's burden to put evidence before the court which can support plaintiff's allegations. In the absence of any such evidence, the court must conclude that defendant testified truthfully on this point, as he, in fact, did.

Plaintiff also questions the following testimony presented by defendant during his 2004 examination.

Question: These trademarks belong to BGA Hellas now?

Answer: These five?

Question: Yes.

Answer**:**   That's correct.

(*Id*. at p. 25).

Here plaintiff seeks to call in question the response of defendant that the trademarks still belonged to BGA Hellas. Plaintiff cites that defendant has testified that defendant had previously, on behalf of Buy Greek Art, tendered 3,000 euros to Ms. Daouti for the purpose of transferring the registration of the trademarks to Buy Greek Art. Plaintiff contends that this establishes defendant's testimony on this issue as a false statement. While a superficial review of the facts might support this position, a more detailed analysis of the timeline of the events and the recordation of the documents reveals that the defendants' testimony is truthful. In fact, defendant admits in his testimony in the same 2004 examination that he had not seen the recorded transfer document, Exhibit P-21. (*Id*. at p. 65).  In fact, at the deposition was the first time defendant had knowledge the form had been received and processed by the U.S. Patent and Trademark Office. After defendant had been shown the document, plaintiff's counsel asked if defendant was surprised to learn of the recorded assignment, to which the defendant responded he was not surprised. (*Id*.). This is, again, an example of defendant being very careful to testify only about that which he knows for certain. Plaintiff argues defendant should have given a more detailed answer. Despite plaintiff's argument on this point, 11 U.S.C. §727(a)(4) is designed to penalize a debtor for making material false statements, not for making statements which unintentionally confuse counsel for creditors. Again, it is the burden of plaintiff's to ask appropriate questions until counsel fully understands the answers, it is not the burden of a debtor to answer questions which are not asked. Accordingly, this statement is not sufficient to sustain plaintiff's objection to discharge.

### 4. Answers to Interrogatories

Plaintiff has also called into question defendant's response to Interrogatory #9. In that interrogatory, defendant was asked to identify all owners, officers or managers of BGA Hellas. Defendant indicated he lacked sufficient information to answer or otherwise respond to this request. Plaintiff argues that defendant made a false statement in this response. That is not true. Defendant's response was consistent with his knowledge at the time of the death of Nick Yiannokopoulos, and, as defendant testified at trial, that he did not know at the time if Ms. Daouti was an owner of BGA Hellas, or simply an heir to the assets of Nick Yiannakopoulos There is a significant distinction, as Ms. Daouti may not have assumed any role or continuation of Mr. Yiannakopoulos' business. To have answered differently would have required an assumption on the part of the defendant, and perhaps would then have been a false statement. Thus, defendant's response to Interrogatory #9 was not a false statement sufficient to sustain plaintiff's objection to discharge.

### 5. Defendant's sworn schedules

Plaintiff finally offers an absurd argument that defendant made a false statement or oath in his bankruptcy schedules by failing to list as income the benefits he receives from his parents for living in their home and in an RV owned by his parents that is parked in their driveway. Plaintiff justifies the argument by claiming the IRS would consider this a taxable benefit the defendant. If that were actually true, every adult child living with their parents in the United States would have to file a tax return and disclose all of the cash and non-cash benefits they receive for staying in their parents' home. Plaintiff has offered no legal authority that this is the practice or codified rule of the IRS. Without any such evidence, plaintiff's argument on this point fails.

Plaintiff nonetheless carries this argument to an even more preposterous claim that defendant must declare as a gift the time he provides to assist his mother in the operation of her business. Again, Plaintiff suggests that the IRS would consider these services a gift or charitable donation. There is no evidence to suggest that either defendant's mother, Martha Kontos, or her d/b/a Buy Greek Art, are charitable organizations. Plaintiff has offered no evidence or argument that the IRS deems such activity as a gift requiring disclosure to the IRS. The absurdity in plaintiff's argument can be illuminated by recognizing the application of the argument in the extreme. Plaintiff's position would require that every adult child who spends time for their parents, such as mowing their parents' grass, would be required to disclose that service to his or her parents as a gift in their tax filings.

Plaintiff also argues that defendant's parents' acquisition of plane tickets through redemption of bonus points and miles accumulated from the use of the parents' credit cards in some way constitutes an income worthy of disclosure on Schedule I. This is simply not true and plaintiff has presented no evidence to this court to the contrary.

Finally, plaintiff argues that the fact that defendant resides in the RV parked on defendant's parents' property and owned by the parents is somehow property defendant holds or controls on behalf of his parents and should have been listed in defendant's Statement of Financial Affairs. This argument falls completely flat, as the RV remains on defendant's parents' property, is titled to defendant's parents, and is fully accessible to defendant's parents, as well as used by them for trips. It defies logic to argue that defendant holds or controls the RV on behalf of his parents. At the very least, it is clear that the representations on this point made on defendant's Statement of Financial Affairs, were made in good faith, as neither the defendant nor his parents believe he is in control or possession of the RV. As such, these are not false

statements, and are not made knowingly and fraudulently with an intent to defraud defendant's creditors.

**B.     Argument**

As outlined above, despite plaintiff's litany of allegations of false statements on the part of defendant, the content of all such statements was either true or believed to be true by defendant at the time the statements were made.  All allegations relating these statements can thus be disregarded.

The evidence presented at trial shows only one statement made by the defendant that could constitute a false statement. This is the failure of defendant to state the name of Nick Yainnokopolous during his 341 meeting. Defendant has admitted that the response was a misstatement. It was one of more than 130 questions asked of him in the hectic environment of the 341 meetings, at a time that he was embarrassed, nervous and emotional. This court has held that a false oath excludes "honest mistakes."  *Michael* at 919.  The Fourth Circuit has further held that, "the subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252 (4th Cir. 1987).  Defendant offered at the 341 meeting, through counsel, to provide Plaintiff any documents about BGA Hellas defendant may have concerning the transfer. Defendant was also forthcoming with full information about Nick Yiannakopolous in his discovery responses, and each of two depositions that followed. The failure to state the name of Nick Yiannakopolous at the 341 meeting was, thus, not a material false statement, as it did not impact, "the discovery of assets, business dealings, or the existence and disposition of his property," as the relevant information was provided contemporaneously by

defendant through other channels. Further, the misstatement at issue did not affect the administration of the bankruptcy case in any fashion. Plaintiff has presented no evidence to the court to the contrary. Accordingly, defendant should not be penalized for making an honest mistake in the midst of the stressful 341 meeting environment, particularly when the information requested was provided in detail by defendant through other channels.

Thus, it is clear that defendant has not made material misstatements such that his discharge should be denied pursuant to 11 U.S.C. §727.

III.    Conclusion

As noted, pursuant to Rule 4005 of the Federal Rules of Bankruptcy Procedure, plaintiff bears the burden of establishing a prima facie case for the denial of discharge to a preponderance of the evidence. Plaintiff has simply not met this burden in this case.

Plaintiff has presented objections based on 11 U.S.C. §727(a)(2) and (a)(4), alleging that defendant transferred an asset within one year prior to filing bankruptcy with an intent to delay, hinder or defraud creditors. Plaintiff has not presented sufficient evidence to carry its burden on any of the four elements of this objection except for the establishing that a transfer actually occurred, which is conceded by defendant. Plaintiff has not established to a preponderance of the evidence that defendant actually owned the asset at issue, that the transfer was made with an intent to delay, hinder or defraud creditors, or that the transfer occurred within one year prior to filing defendant's bankruptcy petition. As such, plaintiff's objection based on §727(a)(2) fails.

Plaintiff then fails in his attempt to establish a prima facie case based on §727(a)(4). As addressed, there was only a single misstatement made by defendant during these proceedings. This misstatement was a result of an honest mistake and was not a material issue in the

bankruptcy proceeding. As such, plaintiff has not presented sufficient evidence to carry its burden with regard to this objection. Accordingly, plaintiff's objection on this point, too, must fail.

In the absence of a prima facie case supporting plaintiff's objections to discharge, such objections fail. Plaintiff's objections to discharge pursuant to 11 U.S.C. §727(a)(2) and (a)(4) fail and defendant should be granted a discharge in his Chapter 7 bankruptcy proceeding.

This the 6th day of November, 2013.

/s/Phillip E. Bolton_____
Phillip E. Bolton SB 12326
Bolton Law Group, PA
PO Box 10247
Greensboro, NC 27404
(336) 294-7777

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that the undersigned has served a copy of the foregoing by electronic means and/or depositing same, enclosed in a postage paid envelope, properly addressed to the following parties in interest, at their last known addresses as shown below, in a post office or official depository under the exclusive care and custody of the United States Post Office in a manner preserved by law:

Bruce Magers
Chapter 7 Trustee
245 Nazetta Way
Lewisville, NC 27023

J. Marshall Shelton
PO Box 1470
Graham, NC 27253

This the 6th day of November, 2013.

/s/Phillip E. Bolton
Phillip E. Bolton SB 12326
Bolton Law Group, PA
PO Box 10247
Greensboro, NC 27404
(336) 294-7777