UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | |
|---|---|
| IN RE:<br><br>George Vlasios Kontos,<br><br>    Debtor. | Case No. 12-50156C-7W |
| Thanco Products and Imports, Inc.,<br><br>    Plaintiff,<br><br>v.<br><br>George Vlasios Kontos,<br><br>    Defendant. | Adversary No. 12-6073 |

## MEMORANDUM OPINION

This adversary proceeding came before the court on October 17, 2013, for trial. J. Marshall Shelton appeared on behalf of the plaintiff and Phillip E. Bolton appeared on behalf of the defendant.

## NATURE OF PROCEEDING

This is a proceeding in which the plaintiff seeks an adjudication denying the defendant a discharge in his chapter 7 case. In its first claim, the plaintiff alleges that the defendant has knowingly and fraudulently made a false oath or account in or in connection to his chapter 7 case and should be denied a discharge pursuant to section 727(a)(4)(A) of the Bankruptcy Code. In a second claim, the plaintiff alleges that within one year before filing his chapter 7 case, the defendant transferred and

concealed property with intent to hinder, delay or defraud creditors and should be denied a discharge pursuant to section 727(a)(2) of the Bankruptcy Code.

FACTUAL BACKGROUND

Between March of 2006 and October of 2007, the defendant registered six trademarks with the United States Patent and Trademark Office.[1] The marks registered by the defendant were "got ouzo?", "Official Member Greek Mafia", "Greek American Princess", "Greek by Marriage", "What happens at the Greek Festival stays at the Greek Festival" and "Greek Time". These marks were registered on March 3, 2006, July 14, 2006, November 2, 2006, January 30, 2007, June 26, 2007 and October 18, 2007, respectively. In each of the applications filed with the Patent and Trademark Office the defendant certified under penalty of perjury that he was the owner of each of the marks and that he had been using the marks in commerce since as early as July of 2003.

Prior to January of 2008, both the plaintiff and defendant had offered for sell products such as T-shirts bearing the mark "got ouzo?" at festivals conducted at Greek Orthodox Churches over a wide geographical area in the United States. In January of 2008 the plaintiff filed a proceeding in the United States Patent and Trademark Office to cancel the defendant's U.S. Trademark Registration of the "got ouzo?" trademark based upon the

---

[1] See Plaintiff's exhibits 14-19.

plaintiff's asserted prior use of the mark. In October of 2008, while the proceeding in the Patent and Trademark Office was still pending, the plaintiff filed a civil action against the defendant in the United States District Court for the Southern District of Texas ("Texas Proceeding"). "[G]ot ouzo?" was the only trademark at issue in the Texas Proceeding.

The complaint in the Texas Proceeding included a claim for trademark infringement in which the plaintiff alleged that the defendant was infringing the plaintiff's "got ouzo?" trademark through his selling products bearing the "got ouzo?" trademark at Greek festivals. The complaint alleged that the defendant was the owner of U.S. Trademark Registration No. 3246800 for a "got ouzo?" trademark but that the plaintiff had used the trademark long before the defendant's registration of the trademark in March of 2006. In addition to the infringement claim, the complaint also included a claim for cancellation of defendant's U.S. Trademark Registration No. 3246800 for the "got ouzo?" trademark based on plaintiff's prior use of the "got ouzo?" mark by the plaintiff and based on fraud by the defendant in his registration of the "got ouzo?" trademark.

On November 5, 2009, a default judgment was entered against the defendant in the Texas Proceeding permanently enjoining the defendant from using the "got ouzo?" trademark, awarding the plaintiff treble damages of $30,843 based on the defendant's use of

the "got ouzo?" trademark and cancelling the defendant's U.S. Registration No. 3246800 for the "got ouzo?" trademark.

Although several appeals by the defendant followed the entry of the judgment in the Texas Proceeding, the judgment ultimately was upheld by the appellate courts. Thereafter, the plaintiff initiated supplemental proceedings in North Carolina where the defendant resided to collect on the judgment entered in the Texas Proceeding. In response, the defendant commenced a chapter 7 proceeding in this court in February of 2012.

The only assets listed by the defendant in his bankruptcy schedules were a small checking account balance, an Ipod, CDs, DVDs, personal pictures, clothing, shoes, a pistol and a malpractice claim against his attorney in the Texas Proceeding. The defendant answered "none" in response to paragraph 22 of Schedule B which called for a listing of any patents, copyrights or other intellectual property owned by the defendant.

## DISCUSSION

In its first claim, the plaintiff argues that the defendant made false statements in connection with his chapter 7 case and that the defendant should be denied a discharge pursuant to section 727(a)(4)(A) of the Bankruptcy Code. Section 727(a)(4)(A) provides:

> (a) The court shall grant the debtor a discharge unless –
>
> > (4) the debtor knowingly and fraudulently, in or in connection with the case –

(A) made a false oath or account

The purpose of section 727(a)(4)(A) is to ensure that a debtor provides complete and accurate information to the bankruptcy court and those with an interest in the administration of the debtor's estate. Northern v. Mack (In re Mack), No. 07-080496, Adversary No. 07-0924, 2009 WL 2998975 at *3 (Bankr. M.D.N.C. Sep. 18, 2009). Creditors are entitled to truthful statements in a debtor's sworn statements so that they may conduct their own investigations of those affairs. See In re Ingle, 70 B.R. 979, 983 (Bankr. E.D.N.C. 1987). Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact. Williamson v. Fireman's Fund Ins. Co., 828 F.2d 249, 251 (4th Cir. 1987).

In order to prevail on a section 727(a)(4)(A) objection, the following five elements must be established: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related to a material matter to the bankruptcy case. Mack, 2009 WL 2998975 at *3; United States v. Seiber (In re Seiber), 489 B.R. 531, 554 (Bankr. D. Md. 2013). See Williamson, 828 F.2d at 251. These elements must be established by a preponderance of the evidence. Farouki v. Emirates Bank Intern., Ltd., 14 F.3d 244, 249 (4th Cir. 1994).

The applicability of section 727(a)(4)(A) in this proceeding hinges on whether the Debtor owned an interest in the trademarks

that he registered in the Patent and Trademark Office when he filed his chapter 7 case. According to the defendant, he did not own the trademarks when he filed for bankruptcy. The defendant has offered two versions of why no trademarks were owned by him when he filed his schedules. The defendant first maintains that he no longer owned the trademarks because he had sold them in October of 2009. The defendant's other version is that he later learned that he had never owned the trademarks and that they had been owned all along by his mother. Neither version is supported by truthful, credible testimony and neither is accepted by the court. Instead, the court is satisfied and finds from a preponderance of the evidence that the defendant owned the trademarks when he registered them, that he continued to own the trademarks thereafter and that his testimony regarding purported transfers of the trademarks to other entities was false. The result is that section 727(a)(4)(A) is applicable in this proceeding and precludes the granting of a discharge to the defendant.

    1.   The Defendant's Testimony Regarding the Alleged Transfers of the Trademarks

Defendant's testimony involving the alleged transfer of the trademarks first surfaced at the section 341 meeting of creditors in the defendant's chapter 7 case which was held on March 2, 2012. The defendant testified under oath at the meeting of creditors. When he was asked whether he had transferred any property prior to the bankruptcy filing, the defendant testified that he had

transferred his trademarks approximately three and a half years earlier. The defendant apparently forgot (or had not yet formulated) the theory that he had never owned any trademarks because of prior use by his mother. Instead, according to the defendant's sworn testimony, he had transferred the trademarks he owned to BGA Hellas which he described as a company that was incorporated or formed in Greece. The defendant's testimony was that he "sold them and assigned them so I could make money to continue the appeals." According to the defendant's further testimony, he did not know who the owners of BGA Hellas were and could not remember the names of the individuals he dealt with when he sold the trademarks to BGA Hellas.

Three months later, in June of 2012, the defendant again was questioned under oath at a Rule 2004 examination. The defendant again testified that he did not own any trademarks and again testified that he had transferred all five of his trademarks to BGA Hellas. However, at this time the defendant's recollection regarding the alleged BGA Hellas transaction was remarkably improved. This time, the defendant recalled that Nick Yiannakopoulos, a native of Greece, owned BGA Hellas and according to the defendant, he had dealt with Mr. Yiannakopoulos when he sold the trademarks to BGA Hellas.

The defendant described Mr. Yiannakopoulos as someone he had known "for a very long time" and who was a close friend that he

frequently talked with when he was in Greece. After testifying that Mr. Yiannakopoulos had realized that the defendant was having difficulties as a result of the plaintiff's pending lawsuit and had offered to make a loan to him, the defendant continued:

> But I wasn't going to take a loan or a gift or whatever else because, you know, what if. You don't ruin a friendship, and they say most friendships are ruined over money. <u>You know, the guy was like a father</u>. . . . <u>We had a very good friendship</u>. And if he would give me money, it would have changed everything. So it was a situation where, okay, I'll take the money. But the guy insisted, and I had sold everything else before then, my rock and roll collection, my athletic collection, my sports collection. So there wasn't a lot of options, so it was like okay, if you want to really do this, then we'll make it a business transaction, and you will be sold this. So it happens, you have – it was not a gift. It was a way to ease my mind, and he kind of understood, and it was a business transaction, and the sale was done.

(Emphasis supplied).

According to the defendant's further testimony at his 2004 examination in June of 2012, he had not seen Mr. Yiannakopoulos since late 2009 or early 2010 and he did not know the status of the trademarks he had sold to Mr. Yiannakopoulos. This testimony stands in sharp contrast to the defendant's testimony at the trial in this proceeding on October 17, 2013. At that time, the defendant testified that he had gone to Greece in December of 2011, to find Mr. Yiannakopoulos in order to buy back the trademarks and had discovered at that time that Mr. Yiannakopoulos had died.

- 8 -

Case 12-06073 Doc 34 Filed 01/13/14 Page 8 of 19

According to the defendant's further trial testimony he returned to Greece in March or April of 2012 to "figure out" who owned the trademarks. While in Greece the defendant testified that he learned that Mr. Yiannakopoulos had a daughter and "after running around the streets" investigating, he finally "ran into the daughter." The defendant then described a face-to-face meeting with the daughter, Lounna Daouti, in which he paid her 3,000 Euros and obtained from her a document (Plaintiff's Exhibit 21) transferring the trademarks to his mother's business, Buy Greek Art. According to the defendant's testimony, all of this occurred in Greece while he was present in Greece.

The court is satisfied that the foregoing testimony by the defendant regarding alleged transfers to and from a purported entity named BGA Hellas is untrue and that the purported transfers are a fabrication created by the defendant to hide and shield the trademarks from creditors.

Had a transfer of the trademarks to an entity named BGA Hellas actually occurred in the manner later described by the defendant at his 2004 examination, the court is satisfied that the defendant would have remembered at his 341 meeting of creditors that the transfer involved Nick Yiannakopoulos, a man described by the defendant at his 2004 examination as being like a father to him and who tried to make a loan to the defendant and, instead, ended up buying the trademarks. Instead, the defendant testified at the 341

meeting of creditors that he could not remember who owned BGA Hellas or who he dealt with when he sold the trademarks to BGA Hellas. Such testimony is not credible and suggests that the defendant simply was not prepared at that time to provide any details regarding the alleged transfer.

While the defendant was prepared to provide details regarding the alleged transfer by the time of his 2004 examination, that testimony is inconsistent with the defendant's later testimony at the trial. At his 2004 examination in June of 2012, the defendant testified that he had not seen Mr. Yiannakopoulos since late 2009 or early 2010 and that he did not know the status of the trademarks. At the trial of this proceeding, the defendant testified that he had gone to Greece in December of 2011 to look for Mr. Yiannakopoulos and at that time had learned that he was dead. If the defendant had learned in December of 2011 that Mr. Yiannakopoulos was deceased as he claimed in his trial testimony, it is odd that he would testify at his 2004 examination in June of 2012 simply that he "had not seen" Mr. Yiannakopoulos since late 2009 or early 2010.

More importantly, however, the defendant's testimony at his 2004 examination in June of 2012 and his trial testimony regarding the status of the trademarks directly conflicts and cannot be reconciled. At his 2004 examination, the defendant testified that he did not know the status of the trademarks. Yet, at trial, the defendant's testimony was that in March of 2012, he had gone to

- 10 -

Greece and obtained a transfer of the trademarks from Lounna Daouti to Buy Greek Art, his mother's business. If, as he testified at trial, he had gone to Greece and obtained a transfer of the trademarks to his mother only a few weeks prior to the 2004 examination, the testimony that he did not know the status of the trademarks was at least intentionally misleading, if not outright false.

There also is a serious inconsistency in the defendant's testimony regarding the alleged transfer from BGA Hellas to Buy Greek Art. According to the defendant's trial testimony, the transfer was handled in a face-to-face meeting with Lounna Daouti that took place in Greece. According to the transfer document the defendant allegedly obtained from Lounna Daouti (Plaintiff's Exhibit 21), the date of the transfer was March 1, 2012, the date of the purported signature of Lounna Daouti. If the defendant's evidence regarding the transfer of the trademarks were true, then the defendant would have been in Greece on March 1, 2012. Such was not the case. In fact, on the morning of March 2, 2012, the very next day, the defendant was in Winston-Salem, North Carolina, testifying at the 341 meeting of creditors. And if a transfer of the trademarks to his mother's company had actually occurred one day prior to March 2, 2012, it is inconceivable that the defendant would not have mentioned such a transfer in the testimony he gave regarding the trademarks on March 2. Given this additional

discrepancy, the court finds that the defendant's evidence regarding a transfer of the copyright from an individual named Lounna Daouti is not credible and is not accepted as reliable evidence that such a transaction ever occurred.

There are other circumstances that indicate that there was no actual transfer of the trademarks by the defendant, beginning with the timing of the alleged transfer to BGA Hellas. The document purporting to transfer the trademarks to BGA Hellas was signed by the defendant on October 30, 2009, only a few days before the November 5, 2009 judgment was entered against the defendant in the Texas Proceeding. At the time of the alleged transfer an entry of default had been entered against the defendant in the Texas Proceeding and, as the defendant was well aware, a motion for entry of default judgment was under consideration by the Texas court. The purported transfer thus came on the eve of a judgment being entered against the defendant.

A further indication that no transfer occurred involves the use of the trademarks following the alleged transfer. Even though the trademarks were allegedly "sold" to Mr. Yiannakopoulos' company in October of 2009, it is undisputed that the defendant or his mother continued to use the trademarks in marketing products at Greek Festivals following the alleged transfer in the same manner they had before the alleged transfer. No authorization was obtained from Mr. Yiannakopoulos and no royalties or other compensation were paid to

him for the use of the trademarks that allegedly were owned by his company. In short, following the alleged transfer, the defendant treated the trademarks as if no transfer had occurred and as though he was still the owner of the trademarks.

In fact, there was no credible evidence of the existence of an entity named BGA Hellas. The only evidence of the existence of such a company consisted of the defendant's conflicting and inconsistent testimony and the two purported transfer documents that the defendant himself prepared (Plaintiff's Exhibits 20 and 21). And when a representative of the plaintiff attempted to verify the existence of BGA Hellas during a trip to Greece, he could not find a trace of such an entity. Instead, he found that the address for BGA Hellas on the transfer document prepared by the defendant was located in a residential neighborhood rather than a business address.

In most instances the defendant was unable or unwilling to provide any information concerning BGA Hellas, disclaiming any familiarity with the company. Yet, when the defendant was asked whether the "BGA" in BGA Hellas stood for "Buy Greek Art" (a name tied to the defendant) the defendant was quick to respond that it stood for "Being Greek Always" despite his avowed lack of familiarity with the company.

    2. Applicability of Section 727(a)(4)(A)

The first requirement under section 727(a)(4)(A) is that there

- 13 -

must be a statement made under oath. A debtor's petition, schedules, statement of financial affairs, testimony given at a section 341 meeting, testimony given at a 2004 examination, answers to interrogatories, and testimony given at a deposition or at trial all constitute statements under oath for purposes of section 727(a)(4)(A). Structured Asset Services, LLC v. Self (In re Self), 325 B.R. 224, 245 (Bankr. N.D. Ill. 2005); 6 Collier on Bankruptcy ¶ 727.04[c]. See Williamson, 828 F.2d at 251; Mack, 2009 WL 2998975 at *3. Furthermore, an omission in the debtor's sworn bankruptcy schedules and statement of financial affairs constitutes a "statement under oath" for purposes of § 727(a)(4)(A). Williamson, 828 F.2d at 251; Mack, 2009 WL 2998975 at *3. Here, the defendant's testimony at his section 341 meeting, his testimony at the 2004 examination, his answers to interrogatories and his testimony at trial all constitute statements made under oath. The Debtor's bankruptcy petition, schedules and statement of financial affair likewise constitute statements made under oath. Thus, the first requirement under section 727(a)(4)(A) has been met.

The second element under section 727(a)(4)(A) is a false statement by the debtor in or in connection with the bankruptcy case. Having considered the numerous conflicts and inconsistencies in the sworn testimony given by the defendant at the meeting of creditors, the 2004 examination, his deposition and at trial, the defendant's demeanor when he testified at trial, and his evasiveness

- 14 -

and failure to provide responsive answers while testifying, the court finds that the above-described testimony by the defendant regarding the purported transfer of his trademarks to BGA Hellas and the purported transfer of the trademarks from BGA Hellas to Buy Greek Art was false and constitutes false statements for purposes of section 727(a)(4)(A).

The court further finds that defendant's statement on line 22 of his Schedule B that he owned no patents, copyrights or other intellectual property also was a false statement for purposes of section 727(a)(4)(A). Consistent with the trademark applications the defendant himself filed with the Patent and Trademark Office certifying that he owned the trademarks and had been using them for years, the court finds that the trademarks, in fact, were owned by him. The defendant's testimony that the trademarks later were transferred was not credible and was insufficient to show that a transfer of the trademarks ever occurred. The defendant's testimony that he never owned the trademarks and that they always belonged to his mother based on her alleged prior use of the trademarks was unsupported and unconvincing. Other than vague references by the defendant, there was no evidence of exactly when and under what circumstances the alleged prior use occurred. Moreover, the defendant's "prior use" version is inconsistent with the defendant's other version of why he no longer owned the trademarks and appears to be simply an alternative ploy for concealing his ownership of the

trademarks. Under his first version he had owned the trademarks but he transferred them, while under his backup, "prior use" version, he never owned them at all. As with defendant's version that he had transferred the trademarks, his prior use version was not supported by credible evidence. The trademarks remained the property of the defendant and the omission of the trademarks from his Schedule B also constituted a false statement. See e.g., Congress Talcott Corp. v. Sicari (In re Sicari), 187 B.R. 861, 881 (Bankr. S.D.N.Y. 1994)(having found that the debtor had retained an interest in property he allegedly had transferred, the court held that his failure to disclose his interest constituted a false oath under section 727(a)(4)(A)).

The third element under section 727(a)(4)(A) is that the debtor must have known the statements at issue were false when he made them. This element is easily found in this proceeding. The testimony at issue involved the defendant falsely describing his own conduct and ascribing to himself conduct and actions that never occurred. The defendant obviously would know the falsity of such statements when he made them. The same is true of his failure to list the trademarks in his schedules. His contention that he did not do so because he believed that they were owned by his mother was not credible and is not accepted as true by the court.

The fourth element under section 727(a)(4)(A) is that the false statements must have been made with intent to defraud. Fraudulent

- 16 -

intent involves a material representation that the debtor knows to be false or an omission that the debtor knows will create an erroneous impression. In re Chavin, 150 F.3d 726, 728 (7th Cir. 1998). Because a debtor is unlikely to testify that he acted with fraudulent intent, fraudulent intent may be established by one of two ways. First, it may be established by circumstantial evidence, or by inferences drawn from a course of conduct. Williamson, 828 F.2d at 252; Mack, 2009 WL 2998975 at *4; Seiber, 489 B.R. at 554. Second, a showing of the debtor's reckless indifference to the truth constitutes the functional equivalent of fraudulent intent. Seiber, 489 B.R. at 554. See Mack, 2009 WL 2998975 at *4. Furthermore, a determination of fraudulent intent under § 727(a)(4)(A) "depends largely upon an assessment of the credibility and demeanor of the debtor." Williamson, 828 F.2d at 252. Based upon the totality of the circumstantial evidence in this proceeding and upon a careful assessment of the credibility and demeanor of the defendant, the court is satisfied that the defendant made the false statements hereinbefore discussed with intent to deceive. The inception of the sham transaction involving the purported transfer of the trademarks to BGA Hellas occurred on the eve of a judgment being entered against the defendant in the Texas Proceeding and served to create the appearance that the trademarks were owned by a foreign entity and not by the defendant. The court is convinced that this ploy was intended by the defendant to deceive Thanco regarding the ownership

- 17 -

Case 12-06073   Doc 34   Filed 01/13/14   Page 17 of 19

of the trademarks in order to frustrate efforts to collect on the impending judgment. From the inception of his bankruptcy case, the defendant continued his efforts to conceal his ownership of the trademarks from Thanco and the bankruptcy trustee with false statements regarding the transfer of the trademarks to and from BGA Hellas. The court is satisfied and finds from the totality of the circumstances surrounding such false testimony, including the defendant's demeanor and credibility, that such false statements were given by the defendant with intent to deceive the bankruptcy trustee and his creditors regarding his ownership of the trademarks.

The final element under section 727(a)(4)(A) is that the statements by the debtor must relate to a material matter to the bankruptcy case. A false statement relates to a material matter when it concerns the existence and disposition of a debtor's property. <u>Williamson</u>, 828 F.2d at 252 (citing <u>In re Chalik</u>, 748 F.2d 616, 618 (11th Cir. 1984)(per curiam)("The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.")). Here, the court finds that the defendant's false statements on his Schedule B and in his testimony regarding his ownership and alleged transfers of the trademarks were material, and thus sufficient to bar discharge, because the statements related to and concerned discovery

Case 12-06073    Doc 34    Filed 01/13/14    Page 18 of 19

of assets, business dealings and existence and disposition of the defendant's property. The trademarks represent the defendant's <u>only</u> non-exempt, non-contingent assets. Discovery of the estate's only valuable asset undoubtedly is a material matter.

Based upon the foregoing findings and conclusions, the court concludes that the defendant should be denied a discharge pursuant to section 727(a)(4)(A) of the Bankruptcy Code.[2]

This 13th day of January, 2014.

*William L. Stocks*
WILLIAM L. STOCKS
United States Bankruptcy Judge

---

[2] Having concluded that the defendant should be denied a discharge pursuant to section 727(a)(4)(A), the court need not address the claim based upon section 727(a)(2).